25166.  NATIONAL LIFE AND ACCIDENT INSURANCE
COMPANY *v.* STROTHER *et al.*

DECIDED APRIL 13, 1936.

*Hendrix & Buchanan,* for plaintiff in error.

*H. A. Allen, J. C. Miner,* contra.

JENKINS, P. J.   The beneficiaries recovered $435, the amount of a life-insurance policy issued on the life of their father.   The insurance company set up the affirmative defense that the insured had made false and fraudulent answers to questions in his application for insurance, as follows:   "Are you in good health? (A.) Yes . .  Who is your doctor?   (A.) Dr. M. K. Jenkins . .  What illness, injury, or accident have you ever had?  Give details.  (A.)  None except children's diseases infancy."  The application was made and signed on August 7, 1934.  The policy was issued on August 13, 1934.  The insured died on September 11, 1934.  There was some dispute under the evidence relative to the healthful appearance, activities, and realization of the insured as to the seriousness of the condition which caused his death; and also some conflict in the testimony of the insurance agent who took the application and that of a daughter of the insured, one of the beneficiaries, on whose initiative the policy was obtained, as to the exact form of the questions in the application as asked by the agent, and what was said by the agent and the replies by the insured.  The daughter testified:  "He asked my father who his doctor was, I believe, and my father told him, Dr. M. K. Jenkins.  Dr. Jenkins was my father's physician at that time,

he had been the physician for about twenty years." While she further testified that he was the "family doctor" of the insured, it does not appear that he had treated the insured for any complaint more recent than an attack of ptomaine poison "early in the spring," which "didn't amount to anything." Other testimony for the plaintiffs is indicated in the syllabus.

Dr. C. A. Rhodes, who was the daughter's "family physician," and was called by her to attend the insured, testified: "I have been a practicing physician in Atlanta since 1911, some 24 years. I took my medical course at Johns Hopkins, and my internship in New York. . . The first time I treated [the insured] was June 25, 1934. . . When I saw him, he was at home in bed. . . He was suffering an intense pain over his gall-bladder region, very sore, and rather prostrated; he had a temperature I think at that time of between 103 and 105; I think his temperature when I saw him was around 104. . . He was a very sick man and my diagnosis at that time was that he had coleo cystitis and infected gall-bladder, and I felt he had gall-stones with it at that time. . . I saw him on my own accord three times on the 26th of June . . and I also saw him twice on the 27th, and after that I saw him up until July 3d, I saw him once. . . He was not able to work from the 25th of June to the 23d of July; he was in bed most of that time. . . On the 5th of July, he came to my office and we x-rayed his gall-bladder . . my opinion is that he had a stone; I couldn't say he did or didn't, but his gall-bladder was entirely out of commission; the bile didn't go back or come out. I recommended that he have an operation to drain the gall-bladder or have it removed, just depending on what they found when they got in it; I didn't intend to operate myself; I don't do that. I recommended on the 5th of July, 1934, that he have an operation, and that is the last time I saw him. A gall-bladder operation is regarded as a major operation. . . I was not [his] personal physician; I had treated his wife and treated a couple of his little boys, but I had never treated him personally; I have treated members of his family. . . I never at any time regarded him as near death, but he was very sick, but I was satisfied all the time he was going to get well. . . I never at any time told [the insured] he was in a dangerous condition."

Dr. Olin S. Cofer, who previously had attended only the daughter of the insured, testified: "I first treated [the insured] on August 1, 1934, at my office . . he gave a history of having had a severe pain in the pit of his stomach about six weeks before, and I found a rather large mass occupying the right side of the abdomen, just beneath the ribs . . this had been present, so he stated, since two or three days after an acute illness of six weeks before. . . We carried him through the x-ray department, and found that he had the right side of the stomach fixed in the region of the gall-bladder, which would show that there was some inflamed condition there to pull it over. We gave him a dye which is supposed to show up in the gall-bladder, and which demonstrated that the gall-bladder was cut off by inflammation or by a stone in the cystic duct, which runs from the gall-bladder to the common duct and thence on into the intestines . . we were not able to show the appendix, which shows that it was obliterated either by inflammation or a very small opening which would not admit the meal we gave him to show up the appendix. That was on August 1, 2, 3, and 4; it took us four days to make a complete examination. After that examination, our findings were enpyana of the gall-bladder and chronic appendicitis. . . I advised him at that time to have an immediate operation; I told him it should be done in the next two or three days; I put him on treatment getting ready for the operation and posted him for the 7th of August; and on the 6th [his daughter] telephoned me he wanted to visit his mother before he went to the hospital, and would come to see me at a later date. . . I didn't see him any more at my office, but I was called to see him on September 6th at his home; I found him in most acute pain, writhing in agony, and nauseated and vomiting. I sent him to the hospital immediately and opened his abdomen as an emergency; I found a rupture of the appendicule abscess. . . This appendix had ruptured previously and formed an abscess, and the abscess had also ruptured into the abdominal cavity; the abdomen was filled with pus; we inserted a half dozen drains. . . When we operated, his gall bladder was badly inflamed. He was operated on on the 6th of September, and died on September 11th of general peritonitis, which is a general poisoning of the abdominal cavity. I said he visited me

244

at the office August 1st, for the first time; he kept coming through the 4th; we prescribed for him his last visit on the 4th; we put him on medicine to prepare for the operation on the 7th; the condition was not amenable to medical measures; it was purely surgical, and I so told him. A gall-bladder operation is regarded as a major operation." The testimony of the daughter denied that the insured knew that this surgeon had made hospital arrangements for the performance of the operation on August 7th, the date of the application, but the essential portions of his testimony as quoted were uncontroverted.

■ "Concealment of material facts may in itself amount to a fraud— . . When, from any reason, one party has a right to expect full communication of the facts from the other. . . [Or] where one party knows that the other is laboring under a delusion with respect to . . the condition of the other party, and yet keeps silent. . . " Code of 1933, § 96-203. These rules are as applicable to contracts of life insurance as to other transactions.

■ A misrepresentation in a life-insurance application as to whether the insured had been attended by a physician would be material, where the insured, if correctly informed, would have had the opportunity to investigate and ascertain for itself the seriousness of the ailment for which the insured was being often treated. "Whether misrepresentations are material is ordinarily a question for the jury; but where . . the evidence excludes every reasonable inference except that they were material, no issue is presented upon that point for determination by the jury. *Jefferson Standard Life Ins. Co.* v. *Henderson,* 37 *Ga. App.* 704 (141 S. E. 498)." *N. Y. Life Ins. Co.* v. *Hollis,* 177 *Ga.* 805, 807 (171 S. E. 288). Where uncontroverted facts show a material misstatement or material fraudulent concealment in answers to questions in an application for life insurance, a verdict will be demanded in favor of the insurer in a suit by the beneficiary on the insurance policy. *Kelly* v. *Interstate Life & Accident Co.,* 49 *Ga. App.* 766 (176 S. E. 793), and cit. In the instant case, the verdict in favor of the plaintiff beneficiaries was contrary to law and without evidence to support it; where, under the undisputed evidence, the insured, in answer to a question as to who was his doctor, gave only the name of his personal family physi-

cian, who had not recently treated him, but failed to give the names of a physician and a surgeon, who, although acting on the initiative of his daughter, immediately prior to his application treated him for a serious abdominal ailment, which had kept him confined at home for about thirty days, with a high temperature during part of the time; where, after the physician had advised an operation, the surgeon, less than a week before the application, told him that his condition would not respond to medical measures and advised him to have an immediate operation on his gall bladder, which was to be performed about the time the insured made the application; and where, in answer to a question as to whether he was in good health, he stated "Yes," and to a question as to his illnesses, answered that he had had "None except children's diseases." Irrespective of the conflict in the testimony of the insurance agent and that of one of the plaintiffs as to the exact form in which these latter questions were asked, and the language used by the agent in connection with them, it is manifest from the evidence that the insured was asked, as he understood, for information with regard to his health and past sicknesses, and that his answers did not reveal the facts which he knew. This is true even under the testimony for the plaintiff, that the agent looked at the insured and said, "There isn't any use to ask you if you are in good health; I can look at you and tell that you are . . [the insured] just laughed and that is all, he didn't make any reply;" and the further testimony that when the agent asked the question, "What illness, injury, or accident have you ever had, give details," the insured did not "quite understand" the agent, and the agent said, "Well, I suppose you have had infant's diseases and colds and things like that," to which the insured replied, "Yes," and the agent asked, "What is the worst illness you have ever had," and the insured answered, "Pneumonia fever, when I was a·baby, twenty something years before." The answers of the insured, in failing to disclose any information as to his recent serious illness, continued medical treatment, and the advised surgical operation, besides failing to state the names of the doctor and the surgeon who had been treating him, vitiated the policy; especially where the insurer, because of the smallness of the amount of the policy, relied entirely on the statements of the insured in the application and his re-

sponses to the questions of its agent, without requiring a medical examination.

*Judgment reversed. Stephens and Sutton, JJ., concur.*